## Flood v. Flood et al.

April 26, 1946.

James C. Clay for appellant.

J. A. Richards for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

A divorce was granted to Mrs. Sadie Flood from V. D. Flood upon the ground of cruel treatment, and alimony of $1500 was adjudged. Her attorney was allowed a $250 fee, to be taxed as part of the costs. The brief for the appellant does not comply with Paragraph 2 of Rule V, requiring a concise statement and classification of the points contended for, but we gather from its body that the contentions are that the divorce should have been granted him on his counterclaim and, therefore, no alimony should have been awarded the plaintiff, nor more than $100, attorney's fee. The wife prosecutes a cross-appeal and contends her alimony should have been at least $3,000.

In the matter of attorney's fee, it is sufficient to say that the judgment is not to the wife for that purpose, but is in favor of the attorney by name, and he is not made a party to the appeal. In such a state of case, we cannot review the allowance. King v. King, 214 Ky. 171, 283 S. W. 73; Sabel v. Sabel, 286 Ky. 575, 151 S. W. 2d 56.

The chancellor reached the conclusion that both parties were in fault, but the greater fault was that of the husband, and measured the alimony by the rule of comparative rectitude.

When the parties embarked upon this matrimonial venture in November, 1940, the appellant was a widower with four children, three of whom were living with him, the youngest being 13 years old, and the appellee was a widow with two children, eleven and fourteen years old. He owned and operated a tourist home in Morehead, which consisted of a large residence and several cot-

tages, where they went to live. His parents also lived in the big house and were dependent upon him for support. He was a rural mail carrier and had other business interests. It was not long before a storm arose. It continued for four years, increasing in fury until the final separation, the day after Christmas, 1944.

The essential substance of the evidence introduced by the wife is that the husband was frequently subject to fits of sullenness and anger, unwarranted and unexplainable. During these moods he harassed and aggravated her in the extreme. Time after time he struck her with various objects and missiles, bruising her body and blacking her eye. On one occasion he suddenly attacked her with the heel of one of her shoes, cutting a long gash in her head, and then cut the telephone wires to prevent her calling for help. Cursing her and her children was a fixed habit. He would abuse, find fault, rave and curse her and her family, all without rhyme or reason. At other times he would be morose and sullen and refuse to talk with her or to eat the meals prepared. for him. He would isolate himself, sometimes for several days, without explanation or reason, but apparently through petulance and pure cussedness. Her life was one of aggravation and exasperation. Her health was impaired by his vicious temperament and brutal actions. She underwent a serious surgical operation and he manifested no sympathy and his only interest seems to have been to complain of the cost and his own inconvenience. She left him on three occasions and twice filed suit for divorce. He would display remorse and contrition, beg her forgiveness and promise to do better, and she would try him again. On one occasion he told her that he would rather live with her and have a fight every day than to live without her. The wife's story of this tempestuous voyage of four years is substantiated in material respects.

The husband's story is also one of rough sailing, with himself as the principal sufferer. The material difference in the two accounts is only as to the blameworthiness and as to who was the aggressor in the shameful fights, which went on night and day. He acknowledged that at times he appeared moody and had withdrawn and isolated himself occasionally, which attitude he attributed to the effect of a head injury sustained in an automobile accident in which his first wife was killed.

He explained that he was troubled with indigestion. But he denied ever having cursed the appellee or having applied to her any epithet more offensive than that she was a "damn liar." He admitted most of the assaults and physical violence, but pleaded self-defense in every instance and claimed to have used no more force than was necessary to repel her attacks all during the course of their marital and martial life. She cursed him and his father and applied vulgar epithets over and over again and threatened to set fire to the cottage where his parents were living. Likewise she endeavored to burn the big house where they lived. Time and again she had hit him over his head with her slipper heel, a favorite weapon of them both. On various occasions she scratched him, blacked his eye, hit him with her fist, a rolling pin, heavy paper weight, syrup bottle, milk bottle, hair brush, and a pipe wrench, with which she had broken in a door to get to him, and had destroyed three alarm clocks in throwing them at him—a costly weapon since no more could then be had for any price. Once she broke all the dishes by throwing them on the floor. He left her on this occasion, but she sought him out and prevailed upon him to return. His story readily suggests the classic, "The Taming of the Shrew," peppered with profanity and vulgarity and ending with the objective unaccomplished.

In rebuttal, the appellee admitted, as she had in part admitted in her original evidence, the application of the epithets and the use of the effective weapons; but she, too, pleaded self-defense, as well as uncontrollable desperation.

To paraphrase the apology in the nursery tale of the Gingham Dog and the Calico Cat, who engaged "in such a terrible spat":

We were not there; we simply state
What the official record doth relate.

To speak seriously. We are impressed with this fair and frank statement of appellee's counsel: "The picture drawn by this record is neither a pretty nor a happy one; the picture of a sullen, moody, unstable, capricious and fretful husband upon the one hand and a hot-tempered and easily irritated wife upon the other, both of whom it may be said to their credit were hard working, conservative and economical in the manage-

ment of their personal affairs and whose marriage might have brought them lasting happiness and a modicum of contentment had there been upon the part of each that forgiveness and forbearance for the faults and errors of the other embodied in their vows when they mutually agreed to accept the other 'for better or for worse.' Nevertheless the picture of their relations as detailed in this record is the result of their own voluntary acts, the canvas and the coloring are their own. The record speaks for itself; the evidence of cruelty and disregard for the rights of the other is plain to the eye reading and the mind considering this record, yet withal it can be fairly said that the greater blame and the larger fault squarely rests upon the shoulders of the husband. In few marriages do we find such opposite and incompatible dispositions, characteristics and natures as we find here. They are probably the results of some uncontrollable and indefinable nature of both parties of causes beyond the power of either party to circumscribe and keep within due bounds, something which doubtless since the instigation of this litigation they each in their own heart and soul have sought the answer to, only to find it unanswered with regret.''

Although the statute, KRS 403.020, provides that a divorce may be granted a wife or a husband upon the ground of cruelty if the other party "is not in like fault," the chancellor realized, as we have said, that in this case neither party was blameless. He expressed the opinion that their dispositions were so incompatible and their differences so irreconcilable that a legal separation should be decreed. In such a state of cause, the statute provides for a divorce from bed and board, KRS 403.-050; Clay v. Clay, 301 Ky. 547, 191 S. W. 2d 819. However, this court could not, if it would, set aside the decree of absolute divorce. We are concerned only with the question of alimony. Kreidler v. Kreidler, 301 Ky. 105, 190 S. W. 2d 1012. Should the court have denied the wife anything out of the husband's estate or should he have granted her a larger sum? We have given full consideration to this large record and cannot but agree with the trial court's opinion that:

''It is not an easy task to finally determine the respective rights of the parties. In considering that question it is well to take stock of the relative duties of the parties in a marriage contract. The marriage vows

provide that each of the contracting parties shall forsake all others for each other, and further that it is the obligation of the husband as the head of the house to provide a home where an opportunity for happiness and contentment may exist.

"A woman of unusual equilibrium and self-control might be able to live under the proven conditions existing at Shady Rest, but the plaintiff must not be condemned because of faults common to all. It must be concluded from the evidence and circumstances surrounding this marriage that the major fault lies with the defendant. In addition to this it appears that some two years before this marriage the first wife of the defendant was killed in an automobile wreck and in which the defendant was severely injured. Evidently he has never completely recovered from that wreck, and, unfortunately, at frequent intervals it caused him to have periods of mental depression, and admittedly those periods, not understood by or attempted to be explained to the plaintiff, were the source of many disagreeable incidents in this home.

"Under all the facts and circumstances I am constrained to the opinion that the plaintiff is entitled to a divorce and which, in view of the fact that the plaintiff has no property and no well defined avocation, entitles her to alimony. In view of the fact that monthly payments of alimony would only contribute to irritate an already disagreeable situation, I have concluded that alimony in a lump sum would best meet the situation for both parties. The estate of the defendant amounts to some ten or twelve thousand dollars and he is gainfully employed. His children are now practically grown, but he must continue to support, as he has done, his aged parents. The expenses of this litigation, which must be borne by the defendant, have been considerable. The children of the plaintiff are grown and she has no dependents."

To the discussion of responsibility we may add the condemnation due any man for striking and wounding any woman except in an extreme case of self-defense. Mere provocation or aggravation does not endue a husband with power to visit violence upon his wife. We are convinced that in many instances the excuse of self-defense offered by the husband was not sustained.

It could be said that when everything is considered, the appellant is worth $2,000 or $3,000 more than that found by the circuit court. It is true that the wife and two of her children received a living from him during the four years; but she earned it, every bit of it. She was an industrious, hard-working woman. More than that, it was his trade to care for them all, and her attention given his children at least balanced the support and the service. But the husband's estate was not increased in value and the appellee had no part in its accumulation. That is a consideration often given in the adjustment of property rights. And as recently discussed in Kreidler v. Kreidler, 301 Ky. 105, 190 S. W. 2d 1012, for many years in the granting of alimony the courts have considered the elements of comparative conduct and the relative responsibility of the husband and wife for the breach in the marriage tie. The conclusion of the whole matter is that, in recognition of the rule to give considerable weight to the finding of the chancellor, we cannot say that the judgment is wrong, either in the allowance of alimony to the wife on the one hand, or in the limitation of the amount on the other.

Wherefore the judgment is affirmed.