## Smith v. Smith.

October 5, 1948.

Earl C. Frankenberger and A. Scott Hamilton for appellant.

Charles A. Walter and Lawrence S. Grauman for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Reversing.

On the 6th day of October, 1943, appellant instituted this action against appellee for divorce on the ground that they had lived separate and apart for a period of five years. Appellee denied the allegations of the petition, and for her counterclaim asked for divorce and alimony on the ground of cruel and inhuman treatment. On the 5th day of October, 1945, appellant amended his

petition charging cruel and inhuman treatment. The testimony was heard on depositions, interrogatories, and oral testimony before Honorable Orrin W. Jenkins, Deputy Commissioner of the Jefferson Circuit Court, who recommended that appellee be granted the divorce and $4,000 lump sum alimony, together with her costs including an attorney's fee of $400.

The case is before us on appeal from that part of the judgment awarding alimony and costs against appellant. Appellant testified to many acts of cruelty toward him on the part of his wife, including, pushing him down the basement steps, striking him in the eyes with wet towels, jabbing table forks into his arm, general indifference on her part to his comfort, welfare, and desires. He testified that because of her physical coldness toward him that they had never consummated any act of sexual intercourse. She virtually admitted this, although she said she tried. In the year 1944 she consulted a doctor who in turn referred her to a specialist. Both physicians declared her to be normal sexually; they observed nothing to prevent her from having children if she desired; and both at that time pronounced her to be a virgin; which findings on their part strongly corroborated the testimony of the appellant. Appellee admitted in her testimony that they had attempted to have intercourse not more than ten times in the six years in which they were married, but, she blames this partly on the fact that appellant's work required him to be out late, and that she would be in bed when he returned home. She also testified that another reason for their failure to have intercourse *more frequently* was appellant's seeming indifference to her. Both his testimony and hers show her to have been most unreasonable in her criticisms of him. He testified that she objected to his appearing before her in his underwear. She first denied this, but later admitted it was true; but said it was a personal matter, and that he would not close the blinds of the house while thus attired. But she was very emphatic in volunteering the information that she violently objected to his appearing before her in the nude. When questioned concerning such appearances she admitted that it was when he was taking a bath; and although he had the bathroom door shut, it was not locked; and she would enter the bathroom while he was

in the bath; whereas, she would not have entered had he locked the door. When asked if she expected him on those occasions to dress she answered "partly."

Appellee complained that when appellant worked late at night, which sometimes he was required to do, he would disturb her in coming into the house. She was asked the following questions and made the following answers concerning these occasions.

"Q. What would he do? A. Just the things that average people do I guess, come in slam doors and throw down books and not intentionally make noise but just disturb me anyhow.

"Q. But you can say that they were the average things a person would do when they came home? A. You can say that.

"Q. Why would he disturb you so greatly? A. Well I was nervous.

"Q. Well you weren't in that condition all of your married life, were you? A. More than anybody knows. You can take a lot—I tried to cover up as best I could, that is all.

"Q. Did you get out of bed (they occupied separate bedrooms) on any one occasion and as much as come in to greet your husband and ask him whether he had had a hard day or good day or if business was good or bad, or offer him anything to eat? A. No." She complained that appellant did not write her while he was in the Armed Forces, but suit for divorce had been filed the day before he entered the Army and we hardly see how she now can claim that his failure to write under those circumstances constitute actionable cruelty. She stated that her father sent her money: "that is how I got my clothes," but she immediately admitted that her husband gave her permission to have charge accounts. She testified to no act of violence against her by him. She complained about his not spending more time at home but admitted that he was working during the time he was absent. In short the record shows that she made no effort to accommodate herself to the schedule it was necessary for him to maintain in order to make a living for both of them and the most of her testimony was devoted to a denial, or defense, of his charges against her.

We will not further detail or comment on the evidence in respect to the fault of the parties bringing about their separation. We think it is obvious from what we have said and quoted that appellee was not without fault in the controversies which gave rise to this litigation.

Appellant owns a house for which he paid the sum of $3,800 and on the purchase price of which he still owes approximately $3,000; in addition thereto, he owns a Pontiac Automobile valued at $1,000, and household furnishings of the value of $750, and two government bonds. He was in the Army at the time his deposition was taken, and testified that after the allotment to his wife was deducted from his pay he received $18 per month. Previous to going into the Army his earnings would run from $200 to $350 per monthly average for the year. Appellee introduced a real estate dealer who testified that appellant's house and lot are worth approximately $9,500. Thus appellant's net worth is approximately $8,300, although the Commissioner, through error, fixed it at approximately $9,300. At the present time appellant is collecting rentals from the real estate at the rate of $45 per month, and paying on the loan the sum of $27.50 per month. In addition thereto, he must pay taxes, make replacements and repairs, and it seems unlikely that he will receive any income over and above the fixed charges and expenses until the loan shall have been retired.

At the time of taking appellee's deposition she was working and receiving in salary the sum of $130 per month, and had accumulated $800 in bonds partly from her earnings, and partly from allotments made to her while appellant was in the Service of his Country during World War II. Where the wife was without fault, and no children are involved, we often have upheld the Chancellor in granting lump sum alimony to as much as one-third of the husband's net estate. But in this case we are convinced beyond doubt that appellee is not without fault in the controversies which gave rise to the separation. That being true we believe that equity demands that we take into consideration the relative responsibility of the husband and wife for the situation which culminated in the separation. Kreidler v. Kreidler, 301 Ky. 105, 190 S.W..2d 1012, Flood v. Flood et al.,

302 Ky. 167, 194 S.W.2d 166. When this test is applied to the circumstances of this case we are of the opinion that a lump sum award of $1,000 would be an extremely liberal allowance to appellee. On return of the case the Chancellor will modify the judgment to this extent. Since the successful party is entitled to recover her costs, the judgment will not be disturbed in this respect. The judgment is reversed for proceedings consistent with this opinion.