**Hazel SCALF, Appellant,**

v.

**W. D. SCALF, Appellee.**

Court of Appeals of Kentucky.

March 14, 1958.

Rehearing Denied May 16, 1958.

Charles G. Cole, Jr., Earl L. Cole, Barbourville, for appellant.

Carlos B. Pope, Barbourville, for appellee.

STANLEY, Commissioner.

We have an appeal from a judgment denying a wife alimony. The divorce decree was entered on the complaint of the husband, William D. Scalf, on the ground that his wife, Hazel Scalf, was guilty of "such cruel beating or injury, or attempt at injury, of the husband as indicates an outrageous temper in the wife, or probable danger to his life, or great bodily injury, from his remaining with her." KRS 403.-020(4) (e). The wife denied the charges and counterclaimed for a divorce for the same cause, as is prescribed by KRS 403.-020(3) (c). She sought judgment for $20,-000 gross sum alimony and $200 a month additional.

We may observe initially that among others there are two conditions under which alimony may be awarded where the husband is entitled to or has obtained a divorce. One is that this court concludes the wife should have been granted the decree. Davis v. Davis, 86 Ky. 32, 4 S.W. 822; West v. West, 264 Ky. 826, 95 S.W.2d 789. The other condition is where the wife is without means of support and was less at fault, the relative degree of misconduct or blame of the parties and the relative responsibility for the termination of the marriage relations, or, as sometimes expressed, the "comparative rectitude" being considered. Burton v. Burton, 184 Ky. 268, 211 S.W. 869; Yaeger v. Yaeger, 197 Ky. 353, 247 S.W. 5; Baker v. Baker, 271 Ky. 735, 113 S.W.2d 16; Green v. Green, 152 Ky. 486, 153 S.W.2d 775; Flood v. Flood, 302 Ky. 167, 194 S.W.2d 166; Gnadinger v. Gnadinger, 309 Ky. 660, 218 S.W.2d 681; Shofner v. Shofner, 310 Ky. 869, 222 S.W. 2d 933; Toomey v. Toomey, Ky., 237 S.W. 2d 533. Forfeiture because of moral delinquency is foreign to the present case.

These rules rest on the fact that the man assumed a moral duty and legal obligation to support the woman he married and the fact that this court cannot reverse that part of the judgment granting a divorce. KRS 21.060(1) (b).

The parties were married October 26, 1956, and separated January 5, 1957, a period of 72 days. The appellee had been married six times before this and divorced six times, the present being his seventh experience. This was the appellant's first venture into matrimony. He was 58 and she was 36 years old.

It appears that for three or four weeks after the marriage Scalf was away from Barbourville a good deal, and his wife lived with her mother in Middlesboro. An apartment was being prepared for their occupancy during this period. They seem to have gotten along all right until the night of December 29 or 30, 1956, when they had a spat. The next day Scalf had his lawyer prepare a suit for divorce, but it was not filed. He testified he had "always been humble and forgiving" so he forgave his bride. But he kept his petition for divorce, believing that he would later need it.

The cause for divorce—and that exclusively—occurred on the night of January 4, 1957. It is not necessary to spread upon this record all the details of this occasion. It seems sufficient to say that Scalf paints this last wife as a nagger and a shrew. But he had known her for fifteen years, and his letters to another after marriage spoke of her in high praise and of his love for her. He testified that she had proposed buying a bedspread, and when he asked "what she would use for money," she got mad and began to abuse and vilify him. After taking a bath, she lay down on the couch and while he was reading a "Bible book" which she had given him for Christmas, she continued to berate and abuse him. She got a strong cord and tried to get him "to tie her up," which he refused to do. He filed in the record a pencil statement written and signed by Mrs. Scalf, bearing date of this night, January 4, reciting that she had requested him "to tie me to a chair, couch or other heavy instrument in order that I may be present in the apartment for notice of divorce action * * * such action having been filed by the plaintiff, W. D. Scalf." We suppose this was made during the heat of battle as something of a dare for him to proceed with his divorce suit. This paper also states that he had told her that "I would have no constitutional rights when he was concerned, and I am led to believe same." He testified that around one o'clock in the morning she tied him with a cord. She denied this and stated it was fantastic. His testimony is that he passively let her do it. Asked why he did so, Scalf replied, "She wore me out, and I was just being humble is all I know." He weighed 165 or 170 and she 125 pounds. During the course of his testimony Scalf stated that all of his several wives had mistreated him.

The wife's version is different. They had been talking about buying a bedspread from a mail order catalogue, and he had agreed. But when she told him the cost, he replied, "That is too God damn much money" and he couldn't afford it. She then tore up the order blank, took a bath and returned to the room. He then and there abused and cursed her violently and threw the Bible story book, which he had been pretending to read, at her. When she had dressed in order to leave, he renewed his cursing and viciously attacked her physically. He threw her down and when she tried to get loose, he jumped upon her with his knees, twisted her arms and otherwise manhandled her so as to make her body "black and bruised." She admitted she tried to defend herself and tried to get loose during this attack. As indicated above, Scalf denied the assault and said she had attacked him and he had held her only in self-defense, and finally she gave out.

Sometime during the early morning a police car was parked near the apartment, which was above a bus station. Scalf says he thought his wife had fainted and he placed a pillow under her head. He then got his pistol and took it down and gave it to one of the policemen because he didn't know but what his wife would get it and shoot him. She followed him down the stairs.

A police officer testified Scalf then told him to take the pistol because he was afraid "that woman is going to kill me," and he wanted protection. She came down immediately and said he was trying to kill her and she wanted protection. He had cord marks on his wrists. She had bruises and skinned places on her arm, knee and ankles and accused Scalf of having "put them there" and of having hit her in the back and hurting her stomach. Her doctor testified that he had been treating Mrs. Scalf for sometime for a mastoid infection. She came to him the day following the conflict. He testified: "She had contusions and abrasions of the right ankle, right knee, right wrist, right forearm, and the right side of her head and neck, and some swelling of the right lobe of the thyroid, some enlargement of the thyroid. My examination of that particular region is rather difficult to evaluate. She complained of some painful area in the region of her back. She did not have any laceration in that area."

Here is a brief sketch of the wreck of the matrimonial bark after a 72 day voyage. Mutual bitterness and the natural disposition to justify self-conduct have doubtless led these parties into exaggeration. But the wife is corroborated by the police officers and the doctor that she had suffered physical violence. The probabilities are also on her side. As stated, he testified that not one or two but all six of his previous wives had mistreated him. He does not deny that he had boasted he had never paid any alimony and that he would "show up" this wife like he had done the others if she sued him for divorce. He is a man of strong build, while she is almost a bantam.

■■ Of course, the common law right of a husband to chastise his wife—if ever there was such—is obsolete, brutal and beyond the scope of present day mores. The striking and beating of a woman without complete justification of self-defense is reprehensible and inexcusable. Flood v. Flood, 302 Ky. 167, 194 S.W.2d 166. It is certainly within the category of cruel treatment and indicative of an "outrageous temper" or probable danger to life or of great bodily injury should the wife have remained with him, which is the cause of divorce she relied on. KRS 403.020(3) (c). We have misgivings whether his proof showed equal cruelty or probable danger to his safety, which is the cause he relied on. KRS 403.020(4) (e). So, there is doubt whether the divorce should have been granted the husband instead of the wife. Cf. McKee v. McKee, 191 Ky. 669, 221 S.W. 213. But whether so or not, we conclude that although there was provocation and recrimination on the wife's part and she was not free from fault but contributed to the breaking up of the marriage, it was

much less in degree and character than was his fault. She should not be left to shift for herself and he be relieved from all obligations to her.

A reasonable survey of the appellee's estate shows it to be substantial. It may be as much as $60,000 or $70,000 net, and his monthly income around $600. The divorced wife has no estate. She was formerly a bookkeeper, but at the time of the trial was unemployed and not in good health. Regard must be had for the fact, however, that she was partially at fault and had made no contribution to the accumulation of the husband's estate. Although very modest, the court is of opinion that, all things considered, the appellant is entitled to a judgment of $2,000. The trial court required him to pay her attorneys a fee of $250 for their services in the trial court. A like sum may be awarded for their services in this court.

The judgment is reversed with directions to enter another judgment in accordance with this opinion.